## BLUE BIRD CAB CO. *v.* MARYLAND DEPARTMENT OF EMPLOYMENT SECURITY

[No. 408, September Term, 1967.]

*Decided November 29, 1968.*

The cause was argued before HAMMOND, C. J., and MAR-BURY, MCWILLIAMS, FINAN, SINGLEY and SMITH, JJ.

*Charles A. Dukes, Jr.,* for appellant.

*James N. Phillips, General Counsel,* with whom were *Francis B. Burch, Attorney General* and *Arnold M. Weiner, Special Assistant Attorney General,* on the brief, for appellee.

MARBURY, J., delivered the opinion of the Court.

On April 5, 1965, the Executive Director of the Department of Employment Security (Department) determined that taxicab drivers who operated cabs owned by the appellant, Blue Bird Cab Co., Inc. (Blue Bird), were employees of the appellant under the Unemployment Insurance Law, Code (1957), Article 95A, Section 20 (g) (6), and that the drivers' services should be reported and contributions should be paid by Blue Bird. He further found that the owner-drivers of taxicabs

(those who own their cabs) were not appellant's employees and that their services were not reportable to the Department. The Board of Appeals of the Department affirmed the executive director's determination on March 18, 1966. Blue Bird appealed to the Circuit Court for Prince George's County. Because of an amendment to Section 20 (g) (6), effective June 1, 1965, which specifically exempted taxicab drivers under certain circumstances, that court remanded the question of coverage since June 1, 1965, to the executive director, but otherwise affirmed the Board of Appeals' decision, and remanded the case to the Department for the purpose of determining the amount of contributions due under Article 95A. This appeal by Blue Bird followed.

Both parties have agreed as to the facts, which consisted of the testimony of Joseph O. Hansen, the secretary-treasurer of Blue Bird, at the Board of Appeals hearing. The petitioner (all references in the following statement refer to appellant) is a Maryland corporation operating a taxicab business and has been reporting to the Department since 1953. However, it has never reported drivers of taxicabs as employees on the theory that they are independent contractors and there is no relationship of service, no wages, no remuneration, and no contract of hire, and, therefore, the drivers are excluded from coverage under Section 20 (g) (6) of the Maryland Unemployment Insurance Law.

There are two types of drivers involved in this case: (1) those who drive cabs owned by the petitioner, and (2) those who own and drive their cabs.

The petitioner owns seventy-four cabs titled in its name, and each cab carries its name on its side. It holds licenses and permits for each of the cabs issued by the Prince George's County Commissioners. The Commissioners also set the cab rates or fares and the company and the drivers are bound by them. The Maryland Public Service Commission has no jurisdiction over this service. The petitioner has a central office and has stands throughout the county. It has no waiting rooms, but sometimes a customer will wait in a small area in the central office until a cab is called. The petitioner has a one-pump gasoline station

and several mechanics. Cabs are leased from the main office. At night a dispatcher handles the issuance of cabs. There is also a two-way radio system for informing drivers of calls for cabs. The dispatcher announces that a call has come in and any driver may bid for it or let it go. The driver nearest the call who wants it gets it. No driver is required to take any call.

The petitioner's cabs were operated by drivers under a verbal "lease" arrangement until recent months (several years ago the agreements were written). Since the passage of Chapter 822 by the 1965 Maryland Assembly, amending Article 95A, Section 20 (g) (6) to specially exclude taxi drivers, petitioner has operated solely with the leases. This Act became effective June 1, 1965. All a driver is required to do to lease a cab is to demonstrate that he is properly licensed, *i.e.,* that he has a special chauffeur's license issued by the hack inspector's office of the Prince George's County Commissioners, as well as a State operator's and chauffeur's license. It is the hack inspector's responsibility to "pick up" a driver's license for law violations, but should any problem less than a law violation occur, and be brought to the petitioner's attention, the petitioner refers that matter to the inspector whose ruling controls whether or not the driver may operate a cab.

The drivers agree to pay a flat rate, usually for twenty-four hours at $12.00 although some have a rate for twelve hours and special rates are in effect for part-time weekend drivers. These rates are $5.00 up to six hours and $9.25 for six-twelve hours.

Under the terms of the lease the driver pays his fees, buys his own gasoline wherever he desires and operates the taxicab without control or direction by the petitioner. He may use the cab for his own personal use and may take it out of the State. The petitioner provides all the maintenance for cabs including sending pickup trucks to any location a cab in need of service may be. Regular periods are established for general maintenance; and in the case of the few individuals who hold cabs continuously, the only requirement is that they return the cab every 4,000 miles for maintenance service. If a driver desires, he may take care of very minor needs, such as putting in a quart of oil, for which he is reimbursed by the petitioner.

The petitioner does not keep a register as such, but the dis-

patcher maintains a card file indicating that the driver is qualified and has a cab on lease at a certain rate. Usually there are more cabs available to be put into service than there are drivers. However, the petitioner does not call or contact any driver to ask him to drive a cab. Drivers may, and frequently do, work one day or perhaps a week or more for one company and then switch to another company. The petitioner does not require and does not receive reports from the drivers. The drivers are required, however, by law to keep a daily manifest. The drivers make no financial report to petitioner. Blue Bird receives no money from customers and has no idea or record of how much is taken in from the public. Each driver keeps his own records and files his own income tax return. No money from the public is reflected as income in the tax return of Blue Bird.

In addition to the cabs owned by the petitioner, there are approximately sixty individual owners of cabs operating under the Blue Bird colors and name. For this privilege and use of the two-way radio they each pay the petitioner $15.50 a week. They take care of their expenses, including taxes and insurance. Each cab owner in addition to having the same type licenses required of a driver who "leases" a cab, must have a permit to operate his cab, which is obtained from the hack inspector. Under it the petitioner may operate with a company, as with the petitioner, or as an independent taxicab service. The petitioner has no control over these individuals who are always free to move to another company and back to the petitioner. They must meet the standards set by the County and operate in this regard in the same manner as those who "lease" cabs. The drivers who lease the cabs may obtain the permits to operate their own cabs freely by application. They do not hold such permits while leasing simply because they do not wish to pay the extra cost. However, many of Blue Bird's current lessees have held permits in the past and may hold them again. Blue Bird often sells older cabs to its lessees who then take a Blue Bird permit as their own and operate independently just as the drivers do.

In order to be sure there is insurance on these cabs, the petitioner demands proof. As a convenience to these owners and also to permit them the benefit of a lower rate than they could

independently obtain, the insurance company covering the petitioners permit these owners to be covered under the master policy. Coverage is issued the owner being insured and the premium for that coverage is paid by him.

On appeal, Blue Bird raises three questions: (1) whether the lower court erred in affirming the decision of the Board of Appeals that Blue Bird was an employer within the meaning of Article 95A, Section 20 (g) (6); (2) whether the failure to make any finding of fact by the Board of Appeals is fatal to its decision; and (3) whether the failure of the Board of Appeals to make findings of fact or conclusions as to any specific time periods, specific persons, or specific wages was error.

The sections of the Unemployment Insurance Law relevant before June 1, 1965, read:

"§ 20. Enumeration.

(g) *Employment and interstate employment.*—

(6) Services performed by an individual for wages or under any contract of hire shall be deemed to be employment subject to this article, irrespective of whether the common-law relationship of master and servant exists, unless and until it is shown to the satisfaction of the Executive Director that

(A) Such individual has been and will continue to be free from control or direction over the performance of such services, both [under] his contract of service and in fact; and

(B) Such service is either outside the usual course of the business for which such service is performed, or that such service is performed outside of all the places of business of the enterprise for which such service is performed; and

(C) Such individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service in question; and"

Since the lower court remanded the question of appellant's liability after June 1, 1965, we shall restrict ourselves to the

question of whether Blue Bird was the employer of drivers who operated Blue Bird owned cabs prior to that date.

In order to remove itself from the purview of the statute, appellant argues that the services performed by the drivers were not performed for wages or under any contract of hire as required, and thus the drivers' services would not be considered as employment subject to the unemployment law. According to Section 20 (n) of Article 95A, " 'Wages' means all remuneration for personal services, including commissions and bonuses and the cash value of all compensation in any medium other than cash." The lower court correctly held that appellant's contention was controlled by *Dep't v. Charlie's Barber Shop*, 230 Md. 470, 187 A. 2d 695. In that case, Charlie "rented" barber chairs in his shop to other barbers who paid him "rent" for the use of the chairs and who were allowed to retain all of the money they received for services rendered. On appeal, the employer urged that the barbers' services were not employment because they were not performed for wages or under any contract of hire. This Court disagreed and held that the other barbers did perform ". . . personal services for remuneration, even though they were paid by the customer, not by appellee. The amount collected as rent may have been the amount of profit appellee expected to make if he had paid them out of total receipts." 230 Md. at 476, 187 A. 2d at 698. The drivers in the instant case also paid a fixed fee to the appellant and were allowed to keep all of the money they received from customers. We hold that the money received by the drivers of Blue Bird owned cabs was remuneration within the wages definition of Article 95A even though they were paid by customers and not by Blue Bird.

Blue Bird urges in the alternative that even if its drivers were rendering services and receiving remuneration, the drivers were excluded from the Act's operation by Section 20 (g) (6) (A) (B) and (C) since they were not subject to appellant's control or direction in operating their cabs, performed services outside of Blue Bird's place of business, and were engaged in an independent established trade. The employer has the burden of showing that the parties concerned fell within the A-B-C test, and since the three conditions are stated conjunctively in-

stead of disjunctively, all three conditions must be met in order to exempt persons rendering services for another from the operation of the statute. *Dep't v. Charlie's Barber Shop, supra; Warren v. Board of Appeals,* 226 Md. 1, 172 A. 2d 124.

As to subsection (A), the lower court placed emphasis upon a written lease agreement which was attached to Mr. Hansen's statement of facts. Under the terms of this agreement the drivers agreed ". . . to obey the operating rules of the Owner, . . . covering general minimum standards of operation and cleanliness, . . ." The drivers also agree not to ". . . sublet or allow any other party to use said leased equipment . . ." and to ". . . reimburse Lessor on return of the equipment to Lessor for any breakage, shortage, or damage to said leased equipment . . . ." The lower court felt that although the written lease did not take effect until approximately June 1, 1965, it would be difficult "to imagine that these restrictions on the drivers were not in effect before the lease was set down in writing . . . ." Accordingly, the court held that Blue Bird's drivers were not free from its control or direction before June 1, 1965. During his oral examination before the Board of Appeals, when Mr. Hansen was asked whether the written lease was the same lease agreement that Blue Bird had been using for years, he responded that it was "the one recently revised." His further testimony indicated that the new lease was designed to meet the terms of the amendment of the law effective June 1, 1965. We cannot say that the lower court was in error in finding that Blue Bird had control over its drivers.

As to subsections (B) and (C), the lower court decided that the drivers' services were not performed outside of all the places of business of the enterprise for which such services were performed, and that the drivers were not engaged in an independently established trade, occupation, or business of the same nature as that involved in the service in question. We conclude that the court was correct. The facts established that Blue Bird held the permits to operate a taxicab business with each of the cabs that it owned. The evidence does not indicate that any of the drivers who rented appellant's cabs had such permits to operate a taxicab business of their own. These drivers, acting in the nature of chauffeurs, simply performed

services for Blue Bird. The evidence established that their services were performed in the usual course of appellant's business, and that they were performed at least in part, within Blue Bird's place of business, in that Blue Bird received telephone calls from potential passengers and relayed them to the drivers over its own radio system. In addition, the drivers picked up fares at appellant's main office and at the several stands it maintained throughout Prince George's County.

Appellant also urges that Chapter 822, Acts of 1965, now codified as Article 95A, Section 20 (g) (6) (E), which provides specific exemption for taxicab drivers under certain circumstances, indicates that the Legislature recognized that the law was being misinterpreted and that the amendment was passed specifically to narrow the coverage of the Unemployment Insurance Law. Appellant cites no legislative history or other authority on this point and this Court is not persuaded by this argument.

We turn briefly to appellant's second question. Blue Bird maintains that the Board of Appeals failed to make any finding of fact whatsoever and that as a result its decision cannot stand. This Court agrees that a fundamental requirement of due process of law in a quasi-judicial proceeding is the right of the parties to be apprised of the facts relied upon by the tribunal in its decision. In this case there was simply no dispute as to the facts. The first sentence of the Board's opinion stated: "The facts in this case have been stipulated by Counsel for the Petitioner." We find that the Board adopted the facts as stipulated. Foreseeing such a finding, appellant states that the Board could not "pick and choose among them to support its conclusion." Upon this point we adopt the opinion of the lower court: "The facts submitted by the Appellant, and stipulated to by the Department, represent a finding of fact and it was upon these facts that the Board made its determination. To say that the Board was bound by such statements that the drivers '. . . are independent contractors and there is no relationship of service, . . . no contract for hire, [etc.] . . .' is mere folly, since these are conclusions of law and not fact."

Finally, Blue Bird complains that the Board's decision was not specific with respect to time periods, actual drivers, or the

wages paid. In view of the fact that the case has been remanded to the Department to ascertain the amount of contributions due under Article 95A on the wages of the drivers who operated cabs owned by Blue Bird before June 1, 1965, we need not deal with this question at the present time. On remand the Department will make such determinations as are proper.

For the above reasons we hold that the lower court's decision was correct and its order will be affirmed.

*Order affirmed. Costs to be paid by appellant.*